**NATIONAL FAMILY CARE LIFE IN-SURANCE COMPANY and NFC Marketing Associates, Appellants,**

v.

**Frances Ann FLETCHER, Appellee.**

**No. 09–00–537–CV.**

Court of Appeals of Texas, Beaumont.

Submitted May 3, 2001.

Decided Oct. 25, 2001.

Hector DeLeon, Thomas P. Washburn, DeLeon, Boggins & Icenogle, P.C., Austin, Thomas W. Duesler, Harris, Lively & Duesler, L.L.P., Beaumont, for appellants.

Michael R. McGown, Benckenstein, Norvell & Nathan, L.L.P., Beaumont, for appellee.

Before WALKER, C.J., BURGESS and GAULTNEY, JJ.

## OPINION

GAULTNEY, Justice.

National Family Care Life Insurance Company and NFC Marketing Associates (collectively "appellants" or "NFC") appeal the trial court's judgment entered in favor of appellee Frances Fletcher. Fletcher filed suit against appellants for breach of contract arising out of an agency agreement, under which she sold insurance on their behalf. She sought renewal commissions she claimed were vested on termination "without cause" of the Agreement. The jury found NFC breached the Agreement and awarded Fletcher $91,380.00 in damages, plus interest and attorney's fees. Appellants raise five issues.

### VENUE

In issue one, appellants contend the record does not support venue in Jefferson County, Texas, where Fletcher filed suit; they argue that venue is proper in Dallas County.

The Supreme Court has stated that where venue may be proper in more than one county under general, mandatory, or permissive venue rules, the plaintiff is given the first choice of venue in the filing of the suit. *See GeoChem Tech Corp. v. Verseckes,* 962 S.W.2d 541, 544 (Tex.1998); *Wilson v. Texas Parks and Wildlife Dep't,* 886 S.W.2d 259, 260 (Tex.1994). If the defendant challenges plaintiff's venue choice, the burden falls on the plaintiff to prove that venue is maintainable in the county of suit. *Id.; Rosales v. H.E. Butt Grocery Co.,* 905 S.W.2d 745, 750 (Tex. App.—San Antonio 1995, writ denied). Since appellants challenged Fletcher's choice, the burden was on her to prove that Jefferson County is a proper venue

site. *In re Masonite Corp.,* 997 S.W.2d 194, 197 (Tex.1999). Our standard of review of the trial court's denial of a motion to transfer venue is found in TEX. CIV. PRAC. & REM.CODE ANN. § 15.064(b) (Vernon 1986). We must conduct an independent review of the entire record, including the trial on the merits. *See Wilson,* 886 S.W.2d at 261.

In support of their position that venue should be maintained in Dallas County, appellants direct us to both the general venue rule in section 15.002(a)(3) of the Texas Civil Practices and Remedies Code and another venue provision in section 15.035(a). *See* TEX. CIV. PRAC. & REM.CODE ANN. §§ 15.002(a)(3), 15.035(a) (Vernon 1986 & Supp.2001). Appellants argue that since their contract with Fletcher expressly provides that the agreement "shall be deemed to have been executed and be performable in Dallas, Dallas County, Texas," venue is proper there under section 15.035(a).[1]

Claiming their principal office is in Dallas County, appellants also contend the general venue rule, as well as section 15.035(a), puts venue there. The general venue rule states that "[e]xcept as otherwise provided by [Subchapter A] or Subchapter B or C," "all lawsuits shall be brought ..." in the venues specified by § 15.002. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 15.002 (Vernon Supp.2001). The "[e]xcept as otherwise provided" language

refers to the definitions and general rules of Subchapter A, the mandatory venue rules in Subchapter B, and the permissive venue rules in Subchapter C.

Section 15.035(a) is not a mandatory venue section; it is permissive. Since it falls in the permissive category, Fletcher was not required to file suit in Dallas County under section 15.035. Neither the reviewing court nor the trial court is required to transfer the case to a permissive venue site when the record shows by probative evidence that venue is proper in the county where plaintiff instituted suit.[2] *See generally* TEX. CIV. PRAC. & REM.CODE ANN. § 15.063(1) (Vernon 1986).

■ Here, there is probative evidence that Jefferson County is the county in which a substantial part of the events or omissions giving rise to the claims occurred; the suit is properly in Jefferson County under the general venue statute. *See* § 15.002(a)(1).[3] Evidence in the record reflects that Fletcher's territory and business activity included Beaumont, Jefferson County. She testified her "East Central" territory included Beaumont; she sold some of the insurance policies in Jefferson County; a portion of the commission payments at issue in the suit came from policies sold in Jefferson County; appellants maintain offices in Jefferson County; appellants issued and Fletcher received some commission checks in Jefferson County; and Fletcher's supervisor

---

**1.** Although appellants direct us to cases citing the predecessor of section 15.035 for the proposition that venue is controlled by the place where the contract requires the defendant (rather than the plaintiff) to perform, those cases do not assist appellants. The controlling principle here is that a plaintiff has first choice on venue selection, as long as she selects a "proper" county. *See In re Masonite Corp.,* 997 S.W.2d at 197.

**2.** We recognize that Fletcher pleaded her venue facts under TEX. CIV. PRAC. & REM.CODE ANN.

§ 15.092(b) (Vernon 1986), which applies to suits brought in justice court, not in district court. However, at trial she presented venue facts, as detailed herein, that demonstrate venue is proper in Jefferson County under section 15.002(a)(1).

**3.** Section 15.002(a)(1) provides "the county in which all or a substantial part of the events or omissions giving rise to the claim occurred" is a proper county in which to file suit. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 15.002(a)(1) (Vernon Supp.2001).

directed her employment from Jefferson County. Based on our independent review of the record, we find probative evidence that Jefferson County is the county in which a substantial part of the events or omissions giving rise to the claim occurred. We overrule issue one.

### CROSS-EXAMINATION

Issues two, three, and four [4] all relate to the trial court's limitation of appellants' right of cross-examination. Specifically, the trial court denied appellants the right to cross-examine Fletcher in three areas: her performance under the contract (a liability issue), her economic damages (the damage issue), and the accuracy of her direct testimony on both issues (impeachment). We address only issue two, since it is dispositive of this appeal.

The complaint here involves more than simply exclusion of relevant evidence or error in rulings on the form or nature of questions; the essential complaint here is that an issue in dispute was blocked off from cross-examination, and supporting evidence, by the trial court. Before we address the basis for the trial court's ruling, we address its context.

■ Protected by both the Fourteenth Amendment to the United States Constitution and article I, section 19, of the Texas Constitution, cross-examination is a fundamental due process right. *See* U.S. CONST. amend. XIV, § 1; TEX. CONST. art. I, § 19; *see also Goldberg v. Kelly*, 397 U.S. 254, 269, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) ("In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses."); *Davidson v. Great Nat'l Life Ins. Co.*, 737 S.W.2d 312, 314 (Tex.1987) ("Due process requires an opportunity to confront and cross-examine adverse witnesses."). Wigmore has characterized cross-examination as follows: "It may be that in more than one sense it takes the place in our system which torture occupied in the mediaeval system of the civilians. Nevertheless, it is beyond any doubt the greatest legal engine ever invented for the discovery of truth." 5 JOHN HENRY WIGMORE, EVIDENCE § 1367, 32 (Chadbourn rev. 1974). The Texas Supreme Court emphasizes that "[c]ross-examination is a safeguard essential to a fair trial and a cornerstone in the quest for truth." *Davidson*, 737 S.W.2d at 314. We therefore review a denial of cross-examination with the utmost scrutiny.

Appellants argue the trial court erred in refusing to allow them to cross-examine Fletcher on the issue of her performance, an ultimate controlling issue under the Agreement. In effect, they maintain that in order to recover on her breach of contract claim, Fletcher had to show, along with the other elements of her cause of action, that she performed or tendered performance under the Agreement. The Agreement expressly provides that all "commissions, bonuses, fees, benefits or other compensation payable to Agent by [appellants] shall immediately cease ... [if] Agent shall violate any of the terms, provisions or covenants of the Agreement." If Fletcher violated the Agreement, she would not have performed her obligations

---

4. In issues two and four, appellants contend the trial court erred in refusing to allow them to cross-examine Fletcher on the issues of performance under the contract and on damages. In issue three, appellants claim the trial court erred in refusing their request for a special issue on excuse, which they pleaded as a defense to Fletcher's breach of contract cause of action. Appellants contend their special issue on excuse was supported by the evidence that would have been developed had the trial court allowed them to cross-examine Fletcher on her alleged non-performance of the Agreement.

under it, and defendants would be relieved of their obligations to pay her the requested compensation. To meet this proof requirement, Fletcher testified she did not violate any of the terms of the contract; appellants argue they had the right to cross-examine her on that issue.[5]

At trial, Fletcher objected to appellants' cross-examination on the ground that the subject matter (performance) on which appellants sought to cross-examine her was irrelevant, as was any evidence appellants offered to support their cross-examination on that issue. Fletcher told the trial court that the basis for her "irrelevancy" objection could be found in appellants' response to her request for disclosure. When asked in Fletcher's request for disclosure to list their "[l]egal theories and, in general, the factual basis of [their] claims or defenses[,]" appellants responded as follows:

*RESPONSE:*

> Defendants specifically deny that Defendants terminated the agreement between Plaintiff and Defendants on or about December 15, 1997. Defendants specifically deny that there is any evidence they terminated said agreement.

> Defendants claim that Ms. Fletcher choose [sic] to terminate the agreement between herself and Defendants as a result of her failure to abide by the terms and conditions of the agreement.

> The incident which caused Ms. Fletcher to terminate her contract with Defendants occurred in December of 1997. Ms. Fletcher insulted the office staff at National Family Care Life Insurance Company to a customer, and the customer, Mr. Ford, wrote a letter of complaint to Defendants. Ms. Sandra Erwin wrote to Ms. Fletcher's manager, Vernell Bateaste, and to Ms. Fletcher demanding that Ms. Fletcher write an apology to the office staff and to Mr. Ford. Ms. Fletcher chose to terminate her agreement with Defendants and instigate this litigation, rather than to issue the requested apologies.

Fletcher argues that appellants' response[6] serves to limit the subject matter on which they may present evidence and conduct cross-examination. Since appellants specifically referenced the Ford incident as being the cause of termination, Fletcher maintains their cross-examination must be restricted solely to that subject matter; she says any other issues, such as her performance or violations of the contract, are irrelevant.

Appellants' offer of proof to the trial court included documents stating that the company's policy was not to replace or add on coverage to existing insurance policies.

**5.** Appellants contested the issue in their general denial and by pleading in their answer Fletcher's violation of the contract as an affirmative defense.

**6.** Appellants' response to Fletcher's disclosure request is not contained in the record on appeal—either as a filed pleading or an exhibit. TEX.R. CIV. P. 191.4(a)(2) provides that discovery responses "must not be filed." The rule also provides in section (d) that "[a]ny person required to serve discovery materials not required to be filed must retain the original or exact copy of the materials during the pendency of the case and any related appel-

late proceedings begun within six months after judgment is signed, unless otherwise provided by the trial court." We note there are exceptions to the "no-filing" rule. *See* Rule 191.4(c). Here, Fletcher attached appellants' response to the request for disclosure to her appellate brief. Although appellants point out in their reply brief that their response is not part of the record, we note they do not dispute its contents. Moreover, the parties discussed the content of the response with the trial court during the trial; that discussion is part of the record.

Several company memos repeated the following instruction:

> WE HAVE CLEARLY INSTRUCTED ALL AGENTS AND MANAGERS THAT EXISTING BUSINESS MAY NOT BE REPLACED OTHER THAN BY THIS OFFICE IF IT IS DEEMED NECESSARY. CONTINUED REPLACEMENT OF EXISTING BUSINESS COULD RESULT IN THE TERMINATION OF THE AGENT/MANAGER INVOLVED PER BOB ERWIN.

This instruction, like other NFC rules and regulations on selling policies, had to be followed by Fletcher and other agents. NFC offered a copy of a letter sent by NFC in December 1997 to Fletcher's supervisor in Beaumont and to Fletcher herself. Appellants specifically referenced this letter in their response to Fletcher's request for disclosure. The letter declared that Fletcher "is and has been the biggest offender of replacing business." Referencing the Ford incident, the letter stated as follows: "If this gentleman's policy had not been rewritten, there would never have been a problem." To rectify the difficulty, NFC instructed Fletcher to write a letter of apology to NFC staff and a letter to Ford "telling him it was her fault." Fletcher refused to do so.

We believe the trial court based its decision to restrict appellants' cross-examination on an overly restrictive interpretation of appellants' response to the request for disclosure. The governing rule, TEX.R. CIV. P. 194.2(c), provides that a party may request, among other things, "the legal theories and, in general, the factual bases of the responding party's claims or defenses (the responding party need not marshal all evidence that may be offered at trial)[.]" We do not view appellants' response—which moves from their general denial of termination, to their defensive theory, to specific evidence pertaining to that theory—as permitting the trial court to restrict cross-examination to the incident with Ford and Fletcher's refusal to apologize to him.

The disclosure response encompassed more than the Ford incident, as is evidenced by the express references in appellants' response to two letters written by Sandra Erwin, the president and CEO of NFC, to Fletcher's supervisor and to Fletcher herself. Also included in appellants' response to the disclosure request was a list of persons with knowledge of relevant facts. Appellants named Ford as one of those persons and described his knowledge of relevant facts as follows:

> Mr. Ford is a customer of [NFC] who wrote a letter of complaint concerning several items, including Ms. Fletcher rewriting his policies and insulting the office staff at [NFC].

From the context of the response, it is clear that the disclosure encompasses the performance issue.

In making the determination to limit appellants' cross-examination, the trial court had before it the response to the disclosure, along with three letters appellants offered as evidence. The trial court reviewed the letters [7] in their entirety and then, in two of the letters, redacted those

---

**7.** The redacted portions of the two letters, both written in December 1997, are as follows: "[Fletcher] is and has been the biggest offender of replacing business. This is the reason we have a Company Policy of not rewriting business. It only creates problems as indicated in the letter. If this gentleman's policy had not been rewritten, there would never have been a problem." (December 9, 1997). "You [Fletcher] have violated Company Policy time and time again by continuing to add on coverage to present policyholders. You have been cautioned in writing." (December 12, 1997). The third letter, dated March 19, 1997, addressed to Fletcher, and signed by Erwin, stated, "It is against Company policy to pay overwrites to someone who does not want to work with people and split business."

portions that expressly described Fletcher's "rewriting" violations of the contract. The third letter was excluded in its entirety. The two letters that the trial court redacted were cited in the disclosure response as evidence of the appellants' legal theories, which were set out by appellants in the second paragraph of their disclosure.

We conclude that appellants' response, when read in the context of the content of the letters referenced in the response, as well as appellants' description of the relevant facts known by Ford, was clearly adequate to put Fletcher on notice of appellants' legal theory, as well as the factual bases of that theory. To the extent that the trial court limited cross-examination because of appellants' response to the request for disclosure, the trial court erred. Appellants were not required to marshal all their evidence in responding to this discovery tool, whose purpose is to obtain early disclosure of basic information.

Furthermore, even if appellants' response to the request for disclosure could somehow serve to restrict the presentation of their defense to the circumstances surrounding the Ford incident, appellants were nonetheless entitled to cross-examine Fletcher on the elements of her cause of action. Performance is an essential element of a breach of contract claim. *See Frost Nat'l Bank v. Burge,* 29 S.W.3d 580, 593 (Tex.App.—Houston [14th Dist.] 2000, no pet.) (The elements are (1) the existence of a valid contract; (2) plaintiff's performance or tender of performance; (3) defendant's breach of the contract; and (4) damage to the plaintiff as a result of defendant's breach.). Because appellants expressly contested the element of performance, evidence of Fletcher's violation of the terms of the contract is relevant to the existence of a fact that is of consequence to the determination of the action.

In addition to the rules of discovery, we look to the rules of evidence. Evidence Rule 611 provides, in pertinent part, as follows:

(a) Control by Court. The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.

(b) Scope of Cross–Examination. A witness may be cross-examined on any matter relevant to any issue in the case, including credibility.

Tex.R. Evid. 611(a), (b). The definition of "relevant evidence" is set forth in Rule 401:

"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

Tex.R. Evid. 401. These rules provide that within the confines of the court's reasonable exercise of control over interrogation of witnesses and presentation of evidence, the parties may cross-examine witnesses on any matter relevant to any issue in the case, including credibility. As we apply Rule 611(b) to this case, appellants had the right to test the credibility of the party bringing the suit on the elements of that party's cause of action. If, upon cross-examination, the party is found to be equivocal or less than truthful, the jury weighs that response and draws its own conclusion. In short, "[t]he right to cross examination is a vital element in a fair adjudication of disputed facts[,]" and it includes "the right to cross examine adverse witnesses and to examine and rebut

all evidence[.]" *Richardson v. City of Pasadena,* 513 S.W.2d 1, 4 (Tex.1974). We, therefore, hold the trial court erred in not allowing appellants to exercise their constitutional right to cross-examine Fletcher on one of the essential elements of her cause of action.

■■ The trial court not only narrowly restricted the subject matter of NFC's cross-examination of Fletcher, it also excluded (on relevance grounds) other evidence appellants offered in support of their theory that Fletcher violated the terms and conditions of the Agreement. Appellants claim the trial court erred in excluding such evidence. In reviewing a trial court's admission or exclusion of evidence, we employ an abuse of discretion standard. *See McEwen v. Wal–Mart Stores, Inc.,* 975 S.W.2d 25, 27 (Tex.App.— San Antonio 1998, pet. denied). In their offer of proof,[8] appellants submitted evidence pertaining to two categories of Fletcher's alleged violations of the Agreement: violation of appellants' "rewriting" policy and the policy regarding "fraternizing" with other company employees. We again focus our analysis on the proof offered by appellants concerning Fletcher's violation of the replacement policy.

As we have noted herein, appellants submitted documents in their offer of proof that established the company's policy against replacement of existing business.

They also submitted two letters referencing the Ford incident that contained express references in their offer of proof to Fletcher's "violat[ion] [of] Company Policy time and time again by continuing to add on coverage to present policyholders." Written in December 1997, both letters were in response to the incident with Ford, the disgruntled policyholder who had submitted complaints about Fletcher; both letters were identified in appellants' response to the request for disclosure. Appellants also offered a 1995 letter, written on NFC letterhead and addressed to Fletcher, in which Fletcher was instructed "not to add any coverage on any existing policyholders." The letter further states the following:

> We want career oriented people, not people using the company and its lead system to become vested for life. I would recommend that you read your contract carefully. It states that in order to receive renewals, you must stay in good graces with the Company at all times. This means doing the things that have been stated in writing to you.

In addition, as we have noted, several memos repeated the instruction that "replacement of existing business could result in the termination" of the agent. The trial court excluded appellants' offer of proof.

■ Appellants' offer of proof included documentary and testimonial evidence that

---

8. Fletcher argues that most of the evidence in appellants' offer of proof is irrelevant, because most of the offered proof occurred prior to her quitting the company in 1996. Her contention is premised on the claim that she "left the employ of [NFC] in June [of that year], but was later hired back by NFC's President the same month." When asked by appellants' counsel at trial if she ever left the company, Fletcher testified "I had talked to [Sandy Erwin] about quitting one time, but it wasn't long enough for me to ... have misses to mess up my contract." "That happened in a day's time. You have to have four misses a

year in order for you to mess up your contract." A June 18, 1996, letter from Erwin to Fletcher stated that Erwin was informed on that day that Fletcher had left the company. According to Fletcher, she came back the same day she left, and her quitting did not affect her contract. Erwin's letter of June 24, 1996, appears to support Fletcher's interpretation, as does another Erwin letter of December 12, 1997. If Fletcher did leave the company for one day in June 1996, her departure and return did not affect the contract, which, along with her vesting rights, continued without interruption until December 1997.

related to violations of the Agreement. The excluded evidence was relevant to Fletcher's "performance," an ultimate issue in the case, and to Fletcher's credibility. We, therefore, find the trial court abused its discretion and erred in excluding this evidence on grounds of irrelevancy, just as it erred in restricting appellants' cross-examination on the same ground. The trial court's limitation of cross-examination and exclusion of relevant evidence in support of that cross-examination effectively muzzled the appellants at trial on a key disputed issue. Since this evidence related to an essential element of Fletcher's cause of action, the error probably caused the rendition of an improper judgment and was harmful. *See generally Brookhart v. Janis*, 384 U.S. 1, 3, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966) (holding that, in the criminal context, "[a] denial of cross-examination ... would be constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it."). We sustain issue two.

We decline to consider issues three and four as they also relate to the denial of cross-examination and would not result in greater relief than the new trial we have granted.

### DAMAGES

In issue five appellants contend there was no evidence, or, in the alternative, insufficient evidence, to support the jury's answer as to the amount of Fletcher's damages. On the legal sufficiency point, appellants claim they are entitled to a judgment that Fletcher recover nothing. We have considered this point because it asks for greater relief that we grant under issue two. Consideration of the factual sufficiency point is unnecessary, however, since appellants would have no greater relief on that point than the remand we grant under issue two.

In reviewing the damages award under a legal sufficiency standard, we consider only the evidence and reasonable inferences supporting the jury's damages finding. *See Minnesota Mining & Mfg. Co. v. Nishika Ltd.*, 953 S.W.2d 733, 738 (Tex.1997). If there is more than a scintilla of evidence favoring the finding, appellants' legal sufficiency challenge must fail. *Id.* Fletcher offered her 1099 form from 1997 which reflected compensation of $30,467.06 for ten months. She testified she was entitled to $1,523 per month in commissions for sixty months or $91,380, the amount the jury awarded her. This testimony, along with the 1099 form, amounts to more than a scintilla of evidence on her damages. The fact that NFC's offer of proof cast doubt upon the calculation of her damages does not affect our legal sufficiency review. "[A]n appellate court generally may not reverse and render a different judgment based on excluded evidence." *See Transport Ins. Co. v. Faircloth*, 898 S.W.2d 269, 275 (Tex. 1995). We cannot conclude on this record that Fletcher's unrebutted evidence was no evidence and thereby render a take nothing judgment. We overrule issue five.

Having sustained issue two, we reverse the judgment of the trial court and remand this case for a new trial.

REVERSED AND REMANDED.

BURGESS, Justice, concurring and dissenting.

I concur in the majority's dispositions of issues one and five. I dissent to the disposition of issue two and would address and overrule issues three and four.

Issue two argues the trial court erred in refusing to allow cross-examination of Fletcher on the issue of her performance

under the Agreement. Appellants claim an ultimate controlling issue in this case is whether Fletcher performed or tendered performance; that as a necessary part of her cause of action for breach of contract, Fletcher had to prove her performance; and that since Fletcher testified on her performance, appellants had the right to cross-examine her on the issue.

Fletcher's trial counsel objected to the excluded evidence on the basis it was irrelevant because "defendants have admitted in their disclosure that the only reason for termination was the alleged statements to Mr. Ford and nothing else; and, therefore, it's irrelevant to any issue in the case." The trial court sustained the objection. Defense counsel responded, "First of all, the disclosure does not say that that's [sic] the only reason for the termination. It says for violations of the agreement—various terms and conditions of the agreement, No. 1. No. 2, this letter goes to the issue of whether there have been violations of terms and conditions of the agreement. And for that reason, we've offered Defendant's Exhibit No. 8; and that's our response." However, in their statement of facts, appellants note, "[a]s a result of a complaint by an insured, Joe Ford, Appellee was sent a letter giving her the option of the [sic] apologizing to Mr. Ford and the Company staff and continuing with the Company or being terminated for cause."

Appellants' brief fails to resolve, or even acknowledge, the variance between their position at trial and that on appeal. *See* Tex.R.App. P. 33.1. On appeal, appellants assert performance is an essential element in a breach of contract claim. *See Frost Nat'l Bank v. Burge*, 29 S.W.3d 580, 593 (Tex.App.—Houston [14th Dist.] 2000, no pet.). I agree, but that does not necessarily place every aspect of Fletcher's performance at issue.

Appellants have never claimed that Fletcher did not, in fact, earn the commissions for which she filed suit and the evidence sought to be introduced only regarded Fletcher's alleged violations of her contract. Fletcher was told she would be terminated if she did not apologize to Mr. Ford. She did not apologize and her checks quit coming. Following the other "violations" appellants sought to introduce, no such action was taken; indeed the record does not reflect any action, other than chastisement, was ever taken.

Furthermore, appellants do not identify which provisions of the agreement were violated, how such violations vitiated the contract, or the "ultimate issue" that Fletcher's alleged past violations would prove. Appellants wholly fail to relate the excluded evidence to the agreement or explain the effect, if any, of such violations on their duty to pay Fletcher renewal commissions. This court has not the ability, nor even the right, to create a party's argument out of whole cloth. *See* Tex. R.App. P. 38.1(h). As the party seeking reversal of a trial court's discretionary decision, it was for appellants to explain and argue the relevance of the excluded evidence to the ultimate issue the jury was asked to resolve, i.e., did they owe Fletcher for the renewal commissions?

Appellants' reliance upon the basic right to cross-examination is therefore misplaced because the right is neither absolute nor unlimited. Cross-examination is limited to "any matter relevant to any issue in the case" and "[e]vidence which is not relevant is inadmissible." Tex.R. Evid. 611(b); Tex.R. Evid. 402. In *Davidson v. Great Nat. Life Ins. Co.*, 737 S.W.2d 312, 314 (Tex.1987), the Court noted the importance of cross-examination:

> Cross-examination is a safeguard essential to a fair trial and a cornerstone in the quest for truth. Longstanding

principles of our jurisprudence recognize the right and necessity of full and complete cross-examination. "... [T]he right to cross-examine a witness is a substantial one, and it is error to so restrict it as to prevent the cross-examining party from going fully into all matters connected with the examination in chief." Due process requires an opportunity to confront and cross-examine adverse witnesses.

*Id.* (quoting *Texas Employers' Ins. Ass'n v. Garza,* 308 S.W.2d 521, 527 (Tex.Civ. App.—Amarillo 1957, writ ref'd n.r.e.)). As *Davidson* notes, the matter must be connected with the examination in chief for the restriction to be error. *Id.* Further, the error must be harmful. *Id.* It must have "probably caused the rendition of an improper judgment" in order to be reversible. *See* Tex.R.App. P. 44.1(a)(1).

Appellants make no attempt to connect the excluded evidence to the Agreement and provide no argument as to how the exclusion caused the rendition of an improper judgment. Accordingly, I cannot conclude the trial court's determination the evidence was not relevant to any issue in this case constituted an abuse of discretion. *See Minns v. Piotrowski,* 904 S.W.2d 161, 172 (Tex.App.—Waco 1995, writ denied). I would overrule issue two.

In their third issue, appellants claim the trial court erred in refusing their request for a special issue on excuse. Assuming, without deciding, that their pleading is sufficient to raise the affirmative defense of excuse based upon Fletcher's violation of the Agreement, appellants fail to inform the court what provisions of the Agreement were violated or how such violations excused their performance. Their argument under this point is based upon the denial of cross-examination on Fletcher's alleged violations of the Agreement. As I

believe there was no reversible error in that regard, I would overrule issue three.

Appellants' fourth issue claims the trial court erred in refusing to allow Fletcher to be cross-examined on damages. On cross-examination, Fletcher was asked if the amount of $30,467 shown on her 1099 form was "just renewal commissions." At that point, Fletcher's counsel asked to approach the bench and a conversation occurred, off the record. The trial court then excused the jury and the following exchange took place.

THE COURT: [Defense], [Plaintiff] objects to your going into calculation of damages based upon your response, or I should say nonresponse, to the request for disclosure. The request for disclosure in standard form prescribed by the rules says the amount and any method of calculating economic damages.

Your response was: Defendants are not making a claim for damages in this suit, which I understand. Obviously, however, that doesn't—the request for disclosure goes to the amount and any method of calculating economic damages for the plaintiff.

. . . .

It would make no sense—if you had—if you had made no claim for damages, then—as you say, then—then obviously the request for disclosure is talking about the plaintiff's damages.

. . . .

And you did not respond to that. I—it seems to me on the face—let me finish, please sir.

. . . .

It seems to me that [Plaintiff's] argument is sound. If you have not suggested to [Plaintiff] through the disclosure process what the—what your position was, then you should not be permitted now,

under the theory of complete disclosure, to—to contest the calculation of economic damages, which this clearly is.

. . . .

[DEFENSE] ... Exhibit No. 1 is the agent's agreement. He's asking for damages and calculation with this agent's agreement. If you look at the agreement, the agreement specifically says that she's entitled to one half of the renewal commissions for a period of 60 months. How can he prove his case unless he can establish what one half of the renewal commissions is? He's got the burden of proving that. I don't.

. . . .

And all—and all that I'm trying to do is establish what it is that she's trying to calculate damages upon because frankly I think that it will be fundamental error to not permit me to cross-examine this witness on their theory of damages, not my theory of damages, but how they arrive at their calculation of damages predicated upon the document under which they seek recovery.

THE COURT: [Plaintiff]?

[PLAINTIFF]: Your Honor, I would feel that would be right had he in his disclosure said we contest your calculations, as I did in my disclosure, of your economic damages.

THE COURT: Did you disclose to him—...—what your calculation was?

[PLAINTIFF]: Yes, I did. ·

And if he comes back and says, you know, I dispute that because these are not renewals, this is A, B, C, D, whatever, then he could do that.

THE COURT: When was—when was the response by the plaintiff filed? When was this response filed by [Defense]?

[PLAINTIFF]: June 28th, 1999, a year ago roughly.

THE COURT: All right. And when did the defendant have your response to the request for disclosure.

[PLAINTIFF]: I did several responses, your Honor . . . . July of '99, February of 2000—two different disclosures, in July of '99 and February of 2000.

THE COURT: So, your—your responses were after the defendant's response?

[PLAINTIFF]: After the defendant's response.

THE COURT: Is there any law which suggests that there is a duty to update a response to a request for disclosure?

[PLAINTIFF]: I think it would be the same as an interrogatory or anything else if you found it to be wrong. Frankly, one of the reasons it was later is I think he asked me later, as far as the July one is concerned. I'm not under an obligation to sua sponte file one.

[DEFENSE]: Wait a minute. Originally—your original response said you wanted $450,00 in damages and then you filed an amended one subsequently and I want to say within the last month or two—

[PLAINTIFF]: February

[DEFENSE]: —that asked for this calculation of $90,000.

Your Honor, I have never run into this as a defendant in a situation where the plaintiff says, well, we don't think you'll ever be able to work again; therefore we want $4 million. I've never been able to run into this situation or I would have said, "Well, what do you calculate it's worth?" I've never had to—

[PLAINTIFF]: I have, and I do.

[DEFENSE]: A general denial is sufficient to put all issues—

THE COURT: As a matter of pleading, I agree with you. We're talking about

discovery and disclosure and whether those create limitations on—on the lawsuit. Surely they should—of if the idea is to—to limit the process to something that the other side knows about instead of trial by ambush.

I'm reading from O'Connor. For example, a plaintiff would be required to state how lost—how loss of past earnings and future earning capacity was calculated, comma, and a defendant in the same suit would be required to disclose any grounds for contesting the damage calculation.

What I understand [Plaintiff] to complain of is that nobody has told him up to now that you were going to complain that his calculation is incorrect.

[DEFENSE]: He didn't make that inquiry, your Honor. That was not his inquiry. His inquiry was not are you contesting whether our damage calculation is incorrect. He asked us what our calculation of damages was, which is his damages. We're not asking for any damages here. And I'm entitled—I'm entitled to cross-examine the witness as to their method of calculating their damages to determine exactly on what basis they arrived at those damages.

THE COURT: But he asked you to disclose what your method of calculating damages was, and you declined to give that to him.

[DEFENSE]: Well, I don't think he was asking me—what I—what I declined to give to him was my calculation of economic damages in terms of the defendant because we had no economic damages.

THE COURT: No, sir, that's not—I—I—with all due respect, that's not what the meaning—the clear and unambiguous meaning of the English language is. . . . The English language says the amount and any method of calculating economic damages.

It might be ambiguous if you were claiming damages, too. But at the time this was framed and until this very moment, you've never made a claim for economic damages. Accordingly, it could only refer to the plaintiff's calculation.

[DEFENSE]: Is the court saying that I will not be permitted to cross-examine this witness on how they arrived at their method of economic damages, your Honor?

THE COURT: Yes, sir, I am.

Rule 194.2(d) provides a party may request disclosure of the amount and any method of calculating economic damages. TEX.R. CIV. P. 194.2(d). Comment 2 provides that (d) is "intended to require disclosure of a party's basic assertions, whether in prosecution of claims or in defense." It further provides as example that in a claim for damages suffered in a car wreck, plaintiff would be required to state how loss of past earnings and future earning capacity was calculated and defendant "would be required to disclose . . . any basis for contesting the damage calculations." TEX.R. CIV. P. 194.2(d) cmt. 2.

Rule 193.6(a) further provides that "[a] party who fails to make, amend, or supplement a discovery response in a timely manner may not introduce in evidence the material or information that was not timely disclosed." TEX.R. CIV. P. 193.6(a). Absent a showing of good cause, lack of unfair surprise, or lack of unfair prejudice, rule 193.6 mandates exclusion of the undisclosed material or information. *See Elliott v. Elliott,* 21 S.W.3d 913, 921 n. 7 (Tex. App.—Fort Worth 2000, pet. denied); *Northwestern Nat. County Mut. Ins. Co. v. Rodriguez,* 18 S.W.3d 718, 722 n. 1 (Tex.App.—San Antonio, 2000, pet. denied). The Supreme Court of Texas in *Alvarado v. Farah Mfg. Co., Inc.,* 830 S.W.2d 911, 915 (Tex.1992), considering former Rule 215(5), refused to either disre-

gard its' plain language prescribing a single sanction for failing to supplement discovery or revise the rule by opinion. The Court noted "the trial court has no discretion to admit testimony excluded by the rule without a showing of good cause." *Id.* at 914. Under current Rule 193.6, it is only logical to extend that holding to the added exceptions of lack of unfair surprise or unfair prejudice. *See* Tex.R. Civ. P. 193.6(a)(2).

Appellants make no argument on appeal regarding Rule 193.6—the basis for the trial court's exclusion. Appellants do not argue they met their burden of establishing an exception to the automatic exclusion. *See* Tex.R. Civ. P. 193.6(b). Clearly, then, the trial court had no discretion to admit the evidence automatically excluded by the rule.

Appellants argue, as they did at trial, only that they had the right to cross-examine Fletcher about her method of calculating damages. As the bill of review demonstrates, appellants sought to contest Fletcher's calculations—the very matter not disclosed in appellants' discovery response. Appellants provide this court with no authority permitting them to do through cross-examination that which they are prohibited from doing by direct examination. The case of *Kreymer v. North Tex. Mun. Water Dist.*, 842 S.W.2d 750, 753 (Tex.App.—Dallas 1992, no writ), is instructive on this issue. In that case, the trial court had allowed a witness who had been designated as an expert by both parties to testify on cross-examination about matters not testified to on direct examination. In finding the trial court did not abuse its discretion, the court declined to end the long-standing tradition in Texas of not limiting cross-examination to the scope of direct examination and the court noted:

The better rule is to require that the scope of the cross-examination fall with-

in the designation of the testimony by either party. If a party has designated that the witness will testify on particular subjects, then the trial court should permit the other side to cross-examine the witness about those subjects, regardless of whether the witness testified to them on direct examination. Only if the scope of the cross-examination exceeds the designation of the expert's testimony should the trial court require the cross-examining party to show good cause or risk having the scope of cross examination limited under rule 215(5). Tex.R. Civ. P. 215(5). If the scope of the cross-examination falls within the scope of the cross-examining party's designation, then the testimony is still admissible on cross-examination.

This interpretation of the rules of procedure and evidence preserves the direct-examining party's right not to have the witness testify beyond the scope of either party's designation, and it preserves the cross-examining party's right to examine a witness "on any matter relevant to any issue in the case, including credibility." Tex.R. Civ. Evid. 611(b).

*Id.* Clearly, under current Rule 193.6, the trial court can limit cross-examination to the scope of the cross-examining party's designation unless there is a showing of good cause, lack of unfair surprise, or lack of prejudice. It is equally clear that the trial court can limit cross-examination to the material or information that was timely disclosed in accordance with Rule 194.2; to avoid such limitations a party has only to comply with Rule 194 or establish one of the three exceptions.

I am aware that in this case the limitation prevented cross-examination of a vital issue. However, in *Kidd v. Paxton*, 1 S.W.3d 309, 312 n. 5 (Tex.App.—Amarillo 1999, pet. denied), the court noted that

"failing to timely supplement discovery can lead to the exclusion of key evidence and effectively grant the opponent certain victory. TEX.R. CIV. P. 193.6." I would overrule issue four.

I would affirm the judgment of the trial court.